468 S.E.2d 309

**Donna Jeannette MEADOWS, Plaintiff Below, Appellant,**

v.

**James Ernest MEADOWS, Jr., Executor of the Estate of James Ernest Meadows, Sr., and Joseph Judson Meadows, Defendants Below, Appellees.**

No. 22812.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1996.

Decided Feb. 14, 1996.

Barbara H. Allen, Allen & Allen, L.C., Charleston, for Appellant.

Warren A. Thornhill III, Beckley, for Appellees.

CLECKLEY, Justice:

This case involves a will contest brought by the plaintiff below and appellant herein, Donna Jeannette Meadows. The plaintiff appeals the final order of the Circuit Court of Raleigh County, entered on August 1, 1994, which directed a verdict in favor of the defendants below and appellees herein, James Ernest Meadows, Jr., Executor of the Estate of James Ernest Meadows, Sr., and Joseph Judson Meadows, after it granted their motion *in limine* to exclude testimony and references of any personal transactions or communications between the plaintiff and her deceased husband, James Ernest Meadows, Sr., pursuant to our Dead Man's Statute, W.Va.Code, 57–3–1 (1937).

I.

FACTUAL AND PROCEDURAL HISTORY

James Ernest Meadows, Sr., died testate on July 5, 1993. The testator is survived by the plaintiff, his wife, and the defendants, two sons from a previous marriage. In his will written on March 31, 1993, the testator left the plaintiff a house which is valued at $80,000, along with the household furniture valued at either $6,000 or $6,750.[1] The plaintiff also received the proceeds from a life

---

1. The plaintiff asserts in her brief that the furniture is valued at $6,750, while the defendants claim it is valued at $6,000. The plaintiff also contends she made substantial contributions to the house and the furnishings.

insurance policy valued at $22,980.54. The remainder of the testator's estate was left to the defendants.[2]

The plaintiff maintains that she and the testator had lived together since December, 1983; however, the couple was not married until February 16, 1993, approximately five months prior to the testator's death. On March 1, 1993, the testator underwent surgery for a brain tumor. According to the plaintiff, after he was released from the hospital, the testator was taking Dilantin, Tylenol 3, and Decadron, a steroid. The plaintiff cared for the testator after his release from the hospital and asserts he did not leave their house until March 31, 1993, the day he executed his will.

After the testator died and the plaintiff learned of the contents of his will, she brought an action to contest the will alleging, in part, that the testator was of unsound mind within the meaning of W.Va.Code, 41–1–2 (1957), when the will was executed. W.Va.Code, 41–1–2, provides that "[n]o person of unsound mind, or under the age of eighteen years, shall be capable of making a will." The plaintiff stated the testamentary provisions in the will did not reflect her husband's intent for the disposition of his assets. The plaintiff generally claims she was under the impression that the testator was leaving her an income.

On June 3, 1994, the defendants filed a motion *in limine* to exclude "any testimony by the plaintiff . . . to any personal transactions or communications between such person and the decedent . . . in accordance with the provisions of Code 57–3–1." The defendants filed a second motion *in limine* on June 8, 1994, requesting the exclusion of any declarations or statements made by the testator that he would " 'take care' of the plaintiff[.]" A pretrial hearing was held before the circuit court on June 8, 1994, to address these issues.

At the hearing, plaintiff's counsel asserted that if the plaintiff were permitted to testify she would state:

"[F]rom the moment she brought him home from the hospital from his brain surgery, which was the 10th or 12th of March, that there was a dramatic change in his conduct. For one thing, he couldn't read, which is very important in a will contest when the question of whether or not he read the will comes up; that he couldn't keep his train of thought; that she had to be responsible for giving him his medications because he simply was very forgetful; that he didn't sleep at all; that she was simply up with him all day and all night; that she would wake up at 2:00 in the morning and find that he was fully dressed and thinking that he was about to go out someplace."

Plaintiff's counsel argued that these factors went to the competency of the testator but conceded she would offer no medical testimony as to competency.

In addition to this testimony, plaintiff's counsel informed the circuit court that she would offer the testimony of Richard D. Edwards who would say that he saw the testator near the time the will was executed and "he could detect a lapse in [the testator's] concentration." Plaintiff's counsel also would offer testimony that the testator told his sister the plaintiff "would be taken care of" and, after the will was executed, told his brother the plaintiff "would never have to worry about anything for the rest of her life, that she was taken care of." Furthermore, several family members would state that the plaintiff had a job and wanted to continue working but gave it up when she went to live with the testator.[3]

At the hearing, defendants' counsel stated that the will executed on March 31, 1993, virtually was identical to the testator's preceding will executed in 1990 or 1991. The only alleged difference between the two wills is that language referring to the plaintiff as a

---

**2.** The plaintiff represents in her brief that the testator died with non-probate assets valued at $172,610.97 and probate assets valued at $555,-642.66.

**3.** The plaintiff maintains that when she quit her job she gave up her financial independence, her paid insurance, and her pension rights that would have vested had she worked two more years.

"beloved friend" was changed to wife. The plaintiff asserts in her brief that neither the original nor a signed copy of this earlier will has been produced.[4]

In its final order, the circuit court ruled that pursuant to W.Va.Code, 57–3–1, the plaintiff would not be permitted to testify about any personal transactions or communications she had with the testator. This ruling excluded testimony from the plaintiff "as to the mental and physical condition or impressions as to the sanity of [the testator] between the date of his brain surgery on March 1, 1993, and the date of his death on July 5, 1993[.]" It also excluded testimony from the plaintiff that the testator declared "that he would take care of [her] and would make provision for her to have a monthly income[.]" Upon consideration of the remaining evidence, namely that the testator reportedly had "some problem concentrating" and "one or more witnesses . . . heard [the testator] . . . say before and after the making of the said Will that he intended to take care of the plaintiff and see that she had a monthly income, which it was contended was inconsistent with the provisions left her by Will," the circuit court directed a verdict in favor of the defendants.

## II.

### DISCUSSION

The issue presented in this case is whether the West Virginia Dead Man's Statute prohibits the admission of an interested party's observations and opinions regarding the mental competency and capacity of a deceased. In ruling on this appeal, we must decide the propriety of our prior opinions in *Freeman v. Freeman,* 71 W.Va. 303, 76 S.E. 657 (1912) (Syllabus Point 5), and *Kuhn v. Shreeve,* 141 W.Va. 170, 177, 89 S.E.2d 685, 691 (1955), where this Court held that the term " 'personal transactions' " as referred to in the statute "include[s] every method whereby one person may derive impressions or information from the conduct, condition or language of another." Upon review, we find

that many of our prior cases have misconstrued the legislative intent of W.Va.Code, 57–3–1, and, therefore, we establish new guidance for its application. In doing so, we reverse the decision of the circuit court and remand this case for further consideration.

### A.

#### *Standard of Review*

In this appeal, the plaintiff alleges the circuit court erred in ruling that her testimony was barred by the West Virginia Dead Man's Statute. In reviewing a circuit court's application of the Dead Man's Statute, we utilize a bifurcated process. First, we review a circuit court's factfinding for clear error and give due deference to the circuit court's application of the statute to the facts applying an abuse of discretion standard. *McDougal v. McCammon,* 193 W.Va. 229, 235, 455 S.E.2d 788, 794 (1995); *Michael v. Sabado,* 192 W.Va. 585, 595, 453 S.E.2d 419, 429 (1994); *Grillis v. Monongahela Power Co.,* 176 W.Va. 662, 666–67, 346 S.E.2d 812, 817 (1986). To the extent the exclusion of the evidence was based either upon a legal precept or an interpretation of a statute, our review is plenary. In other words, we review a circuit court's ruling on the admissibility of testimony under an abuse of discretion standard, but to the extent a circuit court's ruling turns on an interpretation, meaning, or scope of the statute or a rule of evidence our review is *de novo.* *Gentry v. Mangum,* 195 W.Va. 512, 517–18, 466 S.E.2d 171, 176–77 (1995).

### B.

#### *Analysis*

It now is confirmed that the West Virginia Supreme Court possesses paramount authority to adopt rules of evidence for trial courts in this State. *Mayhorn v. Logan Medical Found.,* 193 W.Va. 42, 49, 454 S.E.2d 87, 94 (1994); *Teter v. Old Colony Co.,* 190 W.Va. 711, 724, 441 S.E.2d 728, 741 (1994); *Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990), *overruled on other*

---

4. The plaintiff also asserts in her brief to this Court that she was shown a will in 1984 or 1985 that left her the house and household furnish-

ings. Similarly, neither the original nor a signed copy of this will has been located.

*grounds, Mayhorn, supra.* The competency of a witness to testify is controlled by the West Virginia Rules of Evidence. Specifically, Rule 601 provides: "Every person is competent to be a witness except as otherwise provided for by statute or these rules." Rule 601 is a ground-clearing effort in its attempt to eliminate "the categorized disabilities that existed under common law[.]" 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–1(B)(2) at 609 (3rd ed. 1994). However, there is an important exception. As suggested in *Choi,* this Court by virtue of Rule 601 has elected to defer to the Legislature when the Legislature enacts statutes on the competency of witnesses. 185 W.Va. at 179, 406 S.E.2d at 202. Indeed, the primary purpose for providing for the exception in Rule 601 was to protect the integrity of the West Virginia Dead Man's Statute. In *Cross v. State Farm Mutual Automobile Insurance Co.,* 182 W.Va. 320, 325, 387 S.E.2d 556, 560 (1989), we stated: "At the outset we note that the Dead Man's Statute is still valid under the language of Rule 601 of the *West Virginia Rules of Evidence*[.]" To divine the nature of the issue before us, it is necessary to discuss briefly the history and purpose of the statute.

At common law, no party or person interested in the results or outcome of the judicial proceedings was permitted to testify. The interest of a witness was an absolute disqualification which precluded the witness from giving any testimony. "Thus, as a result of inordinate concern about the possibility of witness perjury, the persons having the greatest knowledge of the facts in dispute were often denied the opportunity to relate that information to the trier of fact. Because such sweeping rules of incompetency could cause significant injustice, they were a target for early reformers of the law of evidence[.]" Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 6.1 at 498 (1995). (Footnote omitted).

In 1843, the disqualification of interested persons was removed in England by statute. 6 and 7 Vict. c. 85 (1843). England started the reform that led to the statutory removal of these qualifying elements in practically every state, including West Virginia. The West Virginia statute, now codified as W.Va. Code, 57–3–1, first was adopted in 1868.[5] It states in pertinent part: "No person offered as a witness in any civil action, suit or proceeding, shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto[.]" Like Rule 601, the statute sweeps away the traditional objection to competency of witnesses, but with the following one exception known as the "Dead Man's Statute":

> "No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such person[.]"

The purpose of the West Virginia Dead Man's Statute is to prevent the injustice that would result from a surviving party to a transaction testifying favorably to himself or herself and adversely to the interest of a decedent, when the decedent's representatives would be hampered in attempting to refute the testimony by reason of the decedent's death. The statute accomplishes this purpose and aids the estate not by making the testimony itself incompetent but, instead, by making the witness incompetent to testify to such matters. In note 6 of *Cross v. State Farm Mutual Automobile Insurance Co.,* 182 W.Va. at 325–26, 387 S.E.2d at 561, we explained that the underlying rationale of dead man's statutes "is that a survivor's lips should be sealed because the lips of the decedent are sealed." In these instances, "the decedent is unable to confront the survivor, give his or her version of the transaction or communication and expose the possible omissions, mistakes or even outright falsehoods of the survivor." 182 W.Va.

---

**5.** 1868 W.Va. Acts ch. 130, §§ 22, 23. For the predecessors to our statute, see 1860 Va. Acts ch. 176, §§ 18, 19 and 1849 Va. Acts ch. 176, §§ 17, 18.

at 326 n. 6, 387 S.E.2d at 561 n. 6. Thus, the premise of the statutes is "that there is a very strong temptation to lie or to conceal material facts to the detriment of the decedent's representative(s)." 182 W.Va. at 326 n. 6, 387 S.E.2d at 561 n. 6, *citing* Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 2.2(D)(1) at 40–41 (2nd ed. 1986); *Moore v. Goode*, 180 W.Va. 78, 89, 375 S.E.2d 549, 560 (1988); *Miami Coal Co., Inc. v. Hudson*, 175 W.Va. 153, 158–59, 332 S.E.2d 114, 119 (1985).[6]

W.Va.Code, 57–3–1, created a change whereby the competency of witnesses became the general rule and incompetency the exception. It is obvious that the first part of W.Va.Code, 57–3–1, is in derogation of common law; nevertheless, to the extent that it removes the disqualification of a witness because of interest, it should be construed liberally as a remedial statute. *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995) ("[w]here an act is clearly remedial in nature, we must construe the statute liberally so as to furnish and accomplish all the purposes intended").

By adopting the first part of the statute, the Legislature intended to expand the opportunities to use testimony which previously had been excluded. This availability is consistent with the general rule announced in Rule 601. We believe that the exclusion of the testimony of a party merely because of interest more likely will result in widespread injustices than would a rule of admissibility subject to the traditional adversarial testing. *See Gentry v. Mangum*, 195 W.Va. 512, 527, 466 S.E.2d 171, 186 (1995) ("'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence'"), *quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 484 (1993); *State v. Thomas*, 187 W.Va. 686, 691, 421 S.E.2d 227, 232 (1992) ("[c]ross-examination is the engine for truth"). *See also Cross v. State Farm Mut. Auto. Ins. Co., supra; Keller v. Hartman*, 175 W.Va. 418, 333 S.E.2d 89 (1985).

On the other hand, to the general rule of witness competency, W.Va.Code, 57–3–1, makes one exception—the Dead Man's Statute. This exception is a limitation on the remedial aspects of the statute because it restricts the testimony of an interested party. Therefore, the language of the Dead Man's Statute should be strictly construed and limited to its narrowest application. *See Harper v. Johnson*, 162 Tex. 117, 345 S.W.2d 277 (1961). By applying this rule, we reduce to a minimum the restrictions on the broader remedial statute. Furthermore, we believe that only a restrictive application of the Dead Man's Statute is consistent with the liberal thrust of the West Virginia Rules of Evidence. 1 Cleckley, *supra* § 1–4(A) at 11 (3rd ed.) (the West Virginia Rules of Evidence "indicate an enhanced confidence in the jury system and the role of the adversarial cross-examination").

█ We begin, as we must, by examining the statutory language, bearing in mind that we should give effect to the legislative will as expressed in the statute. *K mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313, 324 (1988); *Bullman v. D & R Lumber Co.*, 195 W.Va. 129, 133, 464 S.E.2d 771, 775 (1995). In examining statutory language generally, words are given their common usage and "[c]ourts are not free to read into the language what is not there, but rather should apply the statute as written." *State ex rel. Frazier v. Meadows*, 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994). The duty of this Court is to adhere faithfully to the rules of statutory construction rather than to exercise a high degree of ingenuity in an effort to justify a result. Unless an ambiguous term needs

---

**6.** Dead man's statutes have been criticized by about every scholar that has addressed the issue. *See* Mueller & Kirkpatrick, *Evidence* § 6.1 at 504 ("the effectiveness of such statutes is questionable, because a claimant bent on fraud may be able to fabricate some other form of evidence or suborn perjury by a third person whose testimony is not barred"). *See also,* Mason Ladd, *The Dead Man Statute: Some Further Observations and a Legislative Proposal,* 26 Iowa L.Rev. 207 (1941); Roy Ray, *Dead Man's Statutes,* 24 Ohio St.L.J. 89 (1963).

construction, courts should stop with statutory language.

■ With this view to statutory construction, we return to our consideration of the primal issue in this case. The plaintiff's argument is that relevant testimony concerning the mental capacity of the testator should not be barred under W.Va.Code, 57–3–1. The plaintiff asserts that our previous interpretation of W.Va.Code, 57–3–1, in *Kuhn v. Shreeve, supra,* is too broad and should be limited to allow testimony as to mental competency. In *Kuhn,* 141 W.Va. at 177, 89 S.E.2d at 691, we quoted Syllabus Point 5 of *Freeman, supra,* which states: "The words 'personal transactions or communications,' within the meaning of sec. 23, ch. 130, Code [now W.Va.Code, 57–3–1], include every method whereby one person may derive impressions or information from the conduct, condition or language of another." For the following reasons, we agree with the plaintiff's argument.[7]

Upon a reexamination of the purpose of the Dead Man's Statute, in light of all our past decisions and those from other jurisdictions and with regard to the probable legislative intent, we are unable to follow the precedent established in *Kuhn* and *Freeman* that the statute was intended to include the mere unilateral observations and opinions of a survivor of a deceased. The rule of strict construction does not permit such an extension of the Dead Man's Statute by this Court. As we construe the statute, the circuit court committed error by barring the testimony of the plaintiff as to her mental or physical observations and descriptions of the deceased which antedated and post-dated the execution of the will.

■ It is difficult to discern how the proposed testimony of the plaintiff in the instant case as to her observations and opinions concerning the deceased's mental condition could be construed as a "personal transaction" within the contemplation of the Dead Man's Statute exception. We think this exception should not be construed to include a narrative of observed facts. The relationship between the plaintiff and the deceased, while not fortuitous and involuntary, still should not prohibit the plaintiff from testifying as to her observations. The word "transaction" imports a mutuality or concert of action. In our judgment, the word "transaction" includes a business deal where the legal relationship of the parties is altered. To suggest as we did in *Kuhn* and *Freeman* that the term "transaction" includes mere unilateral observations of a survivor is to disregard the customary, common, and ordinary meaning of the word, and we believe that such a holding was a judicial extension of this exclusionary rule far beyond what the Legislature intended.[8] The word "personal" also imports more than a unilateral observation of a survivor as to the conduct of a deceased. Thus, we construe the term "personal transaction" as requiring something in the nature of a negotiation or a course of conduct or a mutuality of responsibility resulting from the voluntary conduct of opposing parties. In this view, a "transaction" results when one enters upon a course of conduct after a knowing exchange of reciprocal acts or conversations. 3 *Jones on Evidence* § 774 at 1440 (5th ed. 1958) ("the better rule is that the term 'transaction' means a mutual transaction between the deceased and the surviving party in which both participate; and the survivor should not be prohibited from describing the event or actions of the deceased ..."); *Wigmore on Evidence* § 578 (3rd ed. 1940).

■ With this construction in mind, we will give the greatest import to the fact that the Dead Man's Statute has the effect of

---

**7.** Other than W.Va.Code, 57–3–1, and Rule 601 of the West Virginia Rules of Evidence, there are no other evidentiary impediments to the admissibility of the testimony that was barred in the present case.

**8.** The word "transaction" is defined in *Webster's New Collegiate Dictionary* 1230 (1979), as "an act, process, or instance of transacting ...;

something transacted, esp: a business deal ...: the often published record of the meeting of a society or association[.]" *Black's Law Dictionary* 1496 (6th ed. 1990), in part, defines "transaction" as: "Act of transacting or conducting any business; between two or more persons; negotiation; that which is done; an affair. An act, agreement, or several acts or agreements between or among parties whereby a cause of action or alteration of legal rights accrue."

limiting evidence in a judicial hearing to something less than all that is available and otherwise admissible. Our decision is most consistent with the policy of law to make available all relevant evidence in the quest for truth. Justice ordinarily will not prevail where only a part of the available evidence affords the only support for the judgment rendered. Again, our statute is clearly a remedial one, and the exception to it should be narrowly construed. Therefore, we hold that where the competence of the maker of a testamentary document is put in issue, the West Virginia Dead Man's Statute does not bar a party or interested witness from testifying as to the deceased's appearance and demeanor and the witness may give an opinion as to the deceased's competency if the other prerequisites of the West Virginia Rules of Evidence are met. *See, e.g., Taylor v. Howett,* 39 Del.Ch. 569, 576, 170 A.2d 917, 921 (1961). Thus, this Court's prior decisions of *Kuhn, supra,* and *Freeman, supra,* are overruled to the extent they are inconsistent with this opinion.

 The plaintiff cites a number of other jurisdictions that hold their dead man's statutes do not bar relevant testimony with regard to mental competency. *See, e.g., Taylor v. Howett,* 39 Del.Ch. 569, 170 A.2d 917 (1961); *Arnold v. Freeman,* 181 Ga. 654, 183 S.E. 811 (1935); *Cato v. Hunt,* 112 Ga. 139, 37 S.E. 183 (1900); *In re Talty's Estate,* 232 Iowa 280, 5 N.W.2d 584 (1942); *In the Matter of the Will of Ricks,* 292 N.C. 28, 231 S.E.2d 856 (1977). Some of these cases discuss in detail the occasion upon which "communications" between the deceased and the party or interested witness may be used to base an opinion of lack of mental competency. To this extent, these cases are consistent with our ruling today, and we further hold that when the communications are not offered for the truth of the matter asserted but are merely the basis for an opinion regarding the mental competency of the deceased, a party or interested witness may use these communications to help explain the opinion. A circuit court, of course, must be vigilant in

scrutinizing this form of evidence and should admit the evidence over an objection made pursuant to Rule 402 or Rule 403 of the Rules of Evidence only if the probative value of such testimony rests mostly on demonstrating the basis of the witness's opinion as to the deceased's mental state. Only then should this evidence be admissible under appropriate limiting instructions notwithstanding the Dead Man's Statute.[9]

To place what we have decided in proper context, it must be emphasized that should the proffered evidence not be excludable under the West Virginia Dead Man's Statute the evidence, nevertheless, must be admissible under the remaining West Virginia Rules of Evidence. All evidence must be relevant under Rules 401, 402, and 403 (relevancy), Rule 602 (firsthand knowledge), Rule 701 (lay-opinion testimony), and Rule 802 (hearsay). If the evidence fails under any of these rules, it should be excluded. Furthermore, in appropriate cases, the opponent is entitled to a limiting instruction advising the jury of the limited purpose for which the evidence is admitted, *i.e.,* to prove mental competency.

Our approach to this issue not only is consistent with the legislative intent but arises from judicial necessity. It arises out of the usual lack of qualified testimony in litigation involving a will. The logic is that the beneficiaries or legatees who would be incompetent under the statute are usually the only ones who have knowledge of the circumstances surrounding the execution of the testator's will. In these instances, we have balanced the need for the testimony against its possible self-serving facet and allow the testimony to be heard, leaving the factfinder to determine the credibility and weight. The credibility of a testifying survivor who is under oath certainly may be evaluated by the jury and tested by cross-examination.

The defendants implicitly place substantial weight on the doctrine of *stare decisis* and contend that if there is any change in law it should come from the Legislature and not

---

**9.** Today's decision does not in any way authorize testimony of an agreement between the plaintiff and the deceased. As we have so held, albeit without setting forth the rationale at length, this

testimony clearly is proscribed under the Dead Man's Statute. *Mann v. Peck,* 139 W.Va. 487, 80 S.E.2d 518 (1954); *Poling v. Huffman,* 48 W.Va. 639, 37 S.E. 526 (1900).

the courts. This generalization oversimplifies the matter and, in the end, is wide of the mark. Unquestionably, uniformity and predictability are important in the formulation and application of our rules of evidence and the doctrine of *stare decisis* counsels that "[v]ery weighty considerations underlie the principle that courts should not lightly overrule past decisions." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339, 358 (1970). In *Moragne*, 398 U.S. at 403, 90 S.Ct. at 1789, 26 L.Ed.2d at 358, the United States Supreme Court enunciated three factors in *stare decisis* analysis which should be weighed prior to rejection of a longstanding rule. These factors are:

> "[1] the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; [2] the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and [3] the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments." 398 U.S. at 403, 90 S.Ct. at 1789, 26 L.Ed.2d at 358.

With respect to the first factor, "considered the mainstay of *stare decisis*," [10] we recognize that the need for predictability in the area of evidence rules is even more essential than in other areas of the law. This principle is true because there are already numerous and inherently unpredictable factors in the trial of a case that may determine what evidence is admissible. On the other hand, it is axiomatic that when rules of evidence are clear parties are able to prepare better for trial and the judicial and legal systems are facilitated in many ways including reduced litigation and the overall ease of application. This factor, therefore, counsels in favor of today's construction of the Dead Man's Statute. The procedural laws' (especially rules' of evidence) values of uniformity, with their companion quality of predictability, a prized value in both simple and complex

litigation, are preserved best by making sure the application of the rules assure the completeness of its fit.

The second factor also points towards our construction of the Dead Man's Statute. Most surrounding jurisdictions, if they have them at all, have different versions of the Dead Man's Statute. Consequently, our continuation of such a strained construction not only contributes to injustice but conceivably promotes forum shopping.[11]

The final strand of the *Moragne* inquiry affords an opportunity for changing "a rule unjustified in reason, which produces different results for breaches of duty in situations that cannot be differentiated in policy." *Moragne*, 398 U.S. at 405, 90 S.Ct. at 1790, 26 L.Ed.2d at 359. The modern liberal thrust of the West Virginia Rules of Evidence represents a conscious policy choice away from a presumption of the inadmissibility of evidence to a presumption of admissibility which will place more information in the hands of the jury for its evaluation. In addition, our construction of the Dead Man's Statute applies uniformly to estate claims—producing the same results for the same breaches of duty irrespective of the availability of the deceased's testimony. Thus, the third *Moragne* factor also counsels in favor of change.

We simply can find no persuasive reason to continue with the precedent established in *Kuhn* and *Freeman.* In note 28 of *State v. Guthrie*, 194 W.Va. 657, 679, 461 S.E.2d 163, 185 (1995), we cautiously explained our reason for overruling prior precedent:

> "Precedent does not cease to be authoritative merely because counsel in a later case advances a new argument. . . . But, as a practical matter, a precedent-creating opinion that contains no extrinsic analysis of an important issue is more vulnerable to being overruled than an opinion which demonstrates that the court was aware of conflicting decisions and gave at least some persuasive discussion as to why the old law must be changed." (Citation omitted).

---

**10.** 398 U.S. at 403, 90 S.Ct. at 1789, 26 L.Ed.2d at 358.

**11.** There is no federal dead man's statute, and federal courts under Rule 601 are not required to

apply state dead man's statutes except in proceedings where state law applies.

Accordingly, we expressly overall all prior decisions to the extent they are inconsistent with this opinion.[12]

### III.

### CONCLUSION

For the foregoing reasons, we find the plaintiff may offer testimony as to the testator's appearance and demeanor and may give an opinion as to his competence if the other prerequisites of the West Virginia Rules of Evidence are met. We, therefore, reverse the final order of the Circuit Court of Raleigh County and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

---

**12.** In addition to *Kuhn* and *Freeman,* today's opinion expressly overrules such decisions as *Doak v. Smith,* 93 W.Va. 133, 116 S.E. 691 (1923), and *Trowbridge v. Stone's Adm'r,* 42 W. Va. 454, 26 S.E. 363 (1896) (prohibiting a party from testifying as to mental competency), and *Willhide v. Biggs,* 118 W.Va. 160, 188 S.E. 876 (1936); *Strode v. Dyer,* 115 W.Va. 733, 177 S.E. 878 (1934) (prohibiting testimony of negligent transaction such as a vehicular collision).